UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 1:11-cr-00085-JMS-KPF |
| | ) | |
| JOHN A. PETERS, III | ) | -01 |
| AARON HOLMES, | ) | -02 |
| a/k/a AARON A. HOLMES, | ) | |
| *Defendants.* | ) | |

## ORDER

Presently before the Court in this drug prosecution are the Defendants' motions to suppress evidence. [Dkts. 114; 117.] The Court held an evidentiary hearing on those motions on February 17, 2012, [dkt. 149], and now issues its findings of fact and conclusions of law.[1]

### FINDINGS OF FACT

In making the findings that follow, the Court has considered the testimony, and the demeanor, of the witnesses who testified at the evidentiary hearing: Officer Christopher Borgmann of the Greenfield Police Department, Deputy Nicholas (Nick) Ernestes of the Hancock County Sheriff's Department, and Officer David (Jeff) Glover of the Richmond Police Department. The Court has also considered the extent to which their testimony is consistent with the exhibits received into evidence (Exhibits 1-13), including the specifically video recordings from Officer Borgmann's and Deputy Ernestes' vehicles that show in detail many of the events in question.

1.      On April 5, 2011, the Proactive Criminal Enforcement ("PACE") Team, a multiagency team of law enforcement, was operating along Interstate 70 in Henry County, Indiana. As Deputy Ernestes explained in his testimony, PACE "proactively" uses traffic- and vehicle-code

_____

[1] Any finding of fact more properly characterized as a conclusion of law is so adopted, and vice versa.

- 1 -

enforcement to investigate suspected criminal activity involving vehicles traveling along the interstate, including narcotics interdiction.

2.     At approximately 9:10 a.m., while parked in a paved crossover near the 126-mile marker on Interstate 70, Officer Borgmann saw a white Denali followed by a Maroon Scion, both traveling eastbound in the right-hand lane.  He believed that the two vehicles were traveling unusually slowly, and together, given the clear weather conditions, the light traffic, and the seventy-mile-per hour speed limit.[2]

3.     Officer Borgmann recalled having previously seen the two Ohio-plated vehicles earlier in the slow lane of a construction zone, while he was driving near the 115-mile marker. While passing the Denali, he had noticed the driver of the Denali had his hands at a rigid "10-and-2" position, with a female passenger in the front seat.

4.     As the vehicles passed the crossover where he was now parked, Officer Borgmann noticed that the driver of the Denali was a black male, who was either still or again driving with his hands rigidly at the "10-and-2" position on the steering wheel.  Although no other evidence confirmed it beyond the driver's rigid body posture—for example, Officer Borgmann observed no erratic driving—Officer Borgmann's report indicated, as did his testimony, that the driver appeared fatigued.

5.     Officer Borgmann's vehicle was visible and, although unmarked, readily identifiable as a police vehicle due to the lights on it.

6.     Once the vehicles passed, Officer Borgmann's laser indicated that the Denali was travelling at fifty-eight miles per hour and the Scion at sixty-two miles per hour.  At no time during the events in question did either vehicle exceed the speed limit.

---

[2] No evidence was presented that a minimum speed limit was established in the area, *see* Ind. Code § 9-21-5-8, or if one existed, that the vehicles traveled below it.

7.    After recording their speed, Officer Borgmann entered the interstate to catch up the vehicles.  He requested that Deputy Ernestes, who had just pulled his police vehicle into the crossover, follow him.

8.    Shortly thereafter, Officer Borgmann and Deputy Ernestes caught up to the Denali and the Scion and boxed them in as follows:



### A. Officer Borgmann's Stop of the Denali

#### i. *The Decision to Make the Stop*

9.      As Officer Borgmann's cruiser approached the front bumper of the Denali, he was talking on his cell phone to Deputy Ernestes about what he was seeing, and attending to his computer, on which he had checked the Denali's license plates.

10.     At 09:13:34, Officer Borgmann's cruiser was alongside the Denali, practically even with its front bumper. At that moment, he claims that he saw the Denali's right tires drive "onto," but not over, the fog line. [Ex. 6.]

11.     The Court cannot credit that claim; it is too improbable. Officer Borgmann's vehicle was lower than the Denali. From his viewing angle, alongside the Denali, it would have been impossible to have seen the location of the Denali's right tires, or to have reasonably estimated their location. Furthermore, Officer Borgmann's cell phone conversation with Deputy Ernestes does not mention that claimed perception about the Denali's tires, meaning that no contemporaneous verification of it exists. At best, Officer Borgmann's subjective desire to justify pulling over the Denali to talk to its occupants may have caused him to later believe that he saw something that, based upon the evidence presented, he could not have.

12.     Officer Borgmann then dropped back slightly. At 09:13:41, while travelling alongside the Denali at a speed in excess of 60 miles per hour, Officer Borgmann told Deputy Ernestes that he saw "gift-wrapped packages" with "tissue paper sticking up" in the back of the Denali. A later search of the Denali would reveal that there were no such packages.

13.     In his report, and later in his testimony, Officer Borgmann would claim that he also saw a foot pressed up against the glass in the backseat, possibly indicating an unrestrained passenger. The Court must reject that claim as not established by a preponderance of the evi-

dence, as well. First, Officer Borgmann's erroneous belief about the presence of visible gift-wrapped packages undermines the Court's ability to credit his claimed ability to perceive events accurately, or even reasonably, while simultaneously driving at high speed into the bright morning sun, while talking on his cell phone, and while both peering into tinted glass and maintaining control of his vehicle. Second, as with the earlier-claimed instance of observing the Denali's tire cross onto the fog line, Officer Borgmann does not mention seeing a foot or possible unrestrained passenger while he is contemporaneously talking with Deputy Ernestes by cell phone.

14. At 09:14:06, Officer Borgmann, while still travelling alongside the Denali, told Deputy Ernestes that the people in the Denali looked "scared to death," and "while it may be nothing" the two cars were "definitely together."

15. As he made that comment, Officer Borgmann let the Denali further advance in the right lane by several car lengths. For several seconds, Officer Borgmann's left tires drifted out of his lane and onto the ridged pavement that warns drivers when they are about to run off the highway.

16. At 09:15:33, Officer Borgmann moved his car into the right-hand lane, directly behind the Denali.

17. At 09:16:25, he believed that he saw the Denali's right tires touch—but not cross—the fog line a second time. [*See* Ex. 6 at 1.] By contrast, almost immediately thereafter, Officer Borgmann himself actually crossed the right fog line, again driving onto the ridged pavement.

18. At 09:16:52, Officer Borgmann turned on his emergency lights, to signal the Denali to pull over. The Denali did so immediately.

19.     When he pulled over the Denali, Officer Borgmann claimed that the Denali's right tires had momentarily driven "onto" the white fog lines at 09:16:25.  The videotape does not conclusively establish this fact.  At most, it shows a fleeting touching of the line, and in no way does it support a finding or reasonable belief that the Denali somehow crossed the fog line and left the lane of travel.

        *ii.   Events During the Stop of the Denali*

20.     At 09:17:36, the driver of the Denali, a man named Kenneth Taylor, exited the vehicle onto the shoulder.

21.     Mr. Taylor told Officer Borgmann that he was en route to his home in Dayton, Ohio, after having visited a friend named John in Chicago for a day and a half.  Mr. Taylor denied travelling with any other vehicle.  Mr. Taylor gave Officer Borgmann a Georgia license.

22.     At 09:19:38, Deputy Ernestes, who had pulled over the Scion, told Officer Borgmann that a passenger in the Scion told him that the Scion was traveling with the vehicle (incorrectly called a "Tahoe") that Officer Borgmann had pulled over.

23.     After Officer Borgmann directed Mr. Taylor to Officer Borgmann's patrol vehicle, Officer Borgmann went to the passenger side of the Denali.  He tapped the front passenger window to request that the female passenger give him the vehicle registration.  At that point, the rear passenger window lowered, and Officer Borgmann began talking with Defendant Aaron Holmes, who was seated there, while the front passenger looked for the registration.[3]

24.     In the third-row of the Denali, Officer Borgmann saw Elisha Thompson lying flat on her stomach.

---

[3] Further underscoring the unlikelihood that Officer Borgmann actually saw a foot in the window was his testimony that he did not know that anyone was seated in the second passenger row until Mr. Holmes' window came down.

25.     Mr. Holmes told Officer Borgmann that they had gone up to Chicago see a sick cousin.  Mr. Holmes became visibly nervous when Officer Borgmann asked him which hospital they visited and how he knew Mr. Taylor.

26.     At approximately 9:25 a.m., Officer Borgmann returned to his vehicle with Mr. Holmes' identification.  The female passengers had no identification.

27.     Officer Borgmann attempted to use his computer to check Mr. Taylor's driver's license and Mr. Holmes' identification.

28.     Officer Borgmann was unsuccessful in running Mr. Taylor's license, despite repeated attempts.  Consequently, he called dispatch, at approximately 9:35 a.m., for assistance running the license.

29.     While Officer Borgmann was unsuccessfully attempting to run Mr. Taylor's license, Mr. Taylor was very nervous in the back seat, developing cotton mouth and repeatedly attempting to spit out the window.  Mr. Taylor was unable to name the registered owner of the Denali.

30.     At approximately 9:40 a.m., dispatch informed Officer Borgmann that Georgia had an outstanding warrant for Mr. Taylor, but one for which Georgia would not extradite.  Dispatch also advised that the Georgia license files were down, so dispatch could not confirm the validity of Mr. Taylor's license.  Shortly thereafter, Deputy Ernestes called to tell Officer Borgmann that he had discovered a rechargeable drill in the back seat of the Scion.

31.     At 9:41 a.m., Officer Borgmann used his in-car computer to issue a warning to Mr. Taylor about Indiana Code § 9-21-8-11, which was the first auto-populated choice that the computer generated after his search "unsafe lane movement."  The second option presented, but which he did not scroll down to see, was for Indiana Code § 9-21-8-24.

32.     The computer screen only provided the code citation and the first few words of the title.  The screen did not show the full text of the statute.

33.     After handing the warning to Mr. Taylor, at approximately 9:45 a.m., Officer Borgmann read Mr. Taylor *Miranda* warnings and questioned him about the possibility of controlled substances being in the car, which Mr. Taylor denied.

34.     At 9:50 a.m., Officer Borgmann retrieved his certified drug-sniffing dog from the back of the patrol car and had the dog conduct an open-air sniff around the Denali.  The dog alerted twice at the rear of the Denali and once at the driver's side door.

35.     At 9:51 a.m., Officer Borgmann returned the dog to the patrol car.

36.     With the assistance of the recently arrived Officer Glover, Officer Borgmann conducted a search of the vehicle, reasonably and in good faith believing that it contained illegal drugs.

37.     The search revealed that one kilogram of heroin was secreted in the center speaker of the vehicle.

38.     No gift-wrapped packages were found.

39.     At approximately 10:09 a.m., Officer Borgmann placed Mr. Taylor and all the Denali's passengers under arrest, including Mr. Holmes.

40.     At 3:07 p.m., well after Mr. Holmes and his passengers had been taken to processing, Officer Borgmann issued a written warning to Ms. Thompson, for having not worn her seatbelt as required by Indiana Code § 9-19-10-2.[4]

### B.  Deputy Ernestes' Stop of the Scion

#### *i.   The Decision to Make the Stop*

---

[4] The fact that the warning was issued so late also reinforces the Court's rejection of Officer Borgmann's testimony that he saw a foot in the glass prior to the stop.

41.     As Deputy Ernestes approached the Scion in the left lane, he saw the Scion following between fifty to seventy-five feet behind the Denali, even though the Scion was traveling at approximately sixty miles per hour.  At that speed and following distance, the Scion had less than two seconds of braking time to the Denali, a distance unreasonably and unsafely close under the circumstances.[5]

42.     To the extent, if any, that the affidavit of Cordell Adams, the driver of the Scion, can be read to suggest that the distance between the Denali and the Scion was always a safe one, [*see* dkt. 88-1, ¶¶5-6], the Court rejects that claim.[6]

43.     At 09:14:52, Deputy Ernestes turned on his emergency lights, to pull over the Scion.  The Scion immediately pulled over.  Because it was unsafe to conduct a traffic stop next to a guardrail, Deputy Ernestes had the Scion pull forward slightly.

### ii.   Events During the Stop of the Scion

44.     At 09:15:35, Deputy Ernestes exited his patrol car and motioned for Mr. Adams to exit the Scion, too.  Mr. Adams complied.

45.     When Deputy Ernestes told Mr. Adams the reason for the stop—i.e. following too closely—Mr. Adams apologized.

46.     Mr. Adams told Deputy Ernestes that he was returning from Chicago to Dayton after having gone to see his sick grandmother.  He denied travelling with another vehicle.  He also told Deputy Ernestes that he did not have a license on him, having left it at home.  He was only driving because the current passenger, Defendant John Peters, had become tired.

---

[5] A vehicle traveling at sixty miles per hour travels eighty-eight feet per second.

[6] Adams did not appear at the hearing.  He was thus unavailable for cross-examination and for the Court to have an opportunity to observe him as he testified.  In any event, the videotape establishes that the Scion was in fact travelling too closely.

47.     At 9:17 a.m., Deputy Ernestes approached the passenger side of the Scion to request identification and the vehicle's registration.

48.     Deputy Ernestes was immediately confronted with the odor of burnt marijuana. On Mr. Peters' lap, Deputy Ernestes saw small green particles that reasonably and in good faith appeared to Deputy Ernestes, based upon his training and experience, to be bits of marijuana.

49.     After asking for identification and telling Mr. Peters that he had marijuana on his lap, Mr. Peters claimed that the particles were from a Black & Mild.

50.     At 09:17:56, Deputy Ernestes reached his hand through the window to pick up one of the particles.  Based upon closer visual inspection, Deputy Ernestes confirmed that the substance was marijuana.

51.     In response to a question from Deputy Ernestes, Mr. Peters told Deputy Ernestes at 9:18 a.m. that the Scion had been travelling with the white vehicle that Officer Borgmann had pulled over.

52.     At 9:21 a.m., Deputy Ernestes told Mr. Peters that he was going to search the vehicle given the marijuana smell. Mr. Peters exited the Scion and, having answered in response to questioning that he had been previously arrested for carrying a concealed weapon, was handcuffed for Deputy Ernestes' safety.  Another officer who had arrived on the scene put Mr. Adams in handcuffs and put Mr. Adams in the officer's patrol car.

53.     A pat-down search of Mr. Peters revealed a large bulge in his pocket, which turned out to be more than $2,500 in cash.

54.     After putting Mr. Peters in the patrol car, at approximately 9:24 a.m., Deputy Ernestes went to the other officer's car to give Mr. Adams *Miranda* warnings and to question him further.

55.     At approximately 9:30 a.m., Deputy Ernestes gave Mr. Peters *Miranda* warnings and questioned him further.

56.     At approximately 9:38 a.m., the search of the Scion began.

57.     Among other things, Deputy Ernestes found what reasonably appeared to be a marijuana stem in the front passenger compartment and a rechargeable drill in the rear of the vehicle. Additionally, when the upper sunglass-storage compartment was removed, the resulting void had a strong odor of marijuana. The holder appeared suspicious because it did not have factory screws and had stress fractures.

## CONCLUSIONS OF LAW

Because a traffic stop constitutes a "seizure" under the Fourth Amendment, it is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). That reasonableness requirement extends not only to the initial stop, but also to its length. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." (citation omitted)). The products of an unconstitutional search are subject to suppression. *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 348 (1974). Before considering the initial validity of the stops and whether they were unreasonably long, however, the Court must first consider the scope of each Defendant's rights under the Fourth Amendment. That latter inquiry is commonly, though perhaps technically incorrectly, termed an inquiry into "standing." *See United States v. Crowder*, 588 F.3d 929, 934 n.5 (7th Cir. 2009) ("[A]lthough our court has explicitly recognized the Su-

preme Court's move away from standing doctrines …, we have continued to use the word 'standing' in the context of Fourth Amendment rights as shorthand to refer to a defendant's ability to challenge a search or seizure based on a reasonable expectation of privacy in the property." (citations omitted)).

### A. Scope of the Defendants' Rights Under the Fourth Amendment

When law enforcement conducts a traffic stop of a vehicle, both the driver of the vehicle and its passengers may challenge the legality of the stop. *Brendlin v. California*, 551 U.S. 249, 251 (2007). Accordingly, as passengers in the respective vehicles, Mr. Holmes can challenge the stop of the Denali, and Mr. Peters can challenge the stop of the Scion.

Unlike Mr. Holmes, [dkt. 153 at 10], Mr. Peters contends that because the Scion and the Denali were travelling together, the occupants of each vehicle can challenge the search of the other vehicle, too, [dkt. 151 at 6-7]. Neither Mr. Peters nor the Government could direct the Court to any authority directly on point. Nonetheless, the Court's own research has revealed authority from the Seventh Circuit that, by analogy, requires the Court to reject Mr. Peters' claim. If absent owners of vehicles cannot challenge the search of their vehicles because "the intrusion a vehicle stop causes is personal to those in the car when it occurs," *United States v. Powell*, 929 F.2d 1190, 1195 (7th Cir. 1991), mere passengers in a separate vehicle in a convoy would likewise lack the ability to raise a constitutional claim about the stopped vehicle.

The Court will, therefore, only analyze the propriety of the search of the Denali vis-à-vis Mr. Holmes, and the search of the Scion vis-à-vis Mr. Peters. The Court's ruling on one will not affect its ruling on the other.

### B. Initial Validity of the Stops

Where, as here, a warrantless seizure occurred—i.e. the stop of the vehicles traveling along the interstate—the Government bears the burden of proving compliance with the Fourth Amendment, by a preponderance of the evidence. *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011) (citation omitted).

If probable cause exists "to believe that a traffic violation has occurred," even a minor one, the Fourth Amendment authorizes a warrantless traffic stop. *Whren,* 517 U.S. at 810 (citations omitted). Probable cause requires "a reasonable belief that a law has been broken." *United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006). That inquiry is an objective one. *Whren*, 517 U.S. at 813; *Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."). The probable-cause inquiry has two steps: First, determine what facts the officer knew at the time of the traffic stop, and, second, "decide whether a reasonable officer could conclude that these facts amount to a violation of the law." *Garcia-Garcia*, 633 F.3d at 613. Unreasonable mistakes of fact cannot support probable cause. *MacDonald*, 453 F.3d at 962 ("When an officer makes a stop based on a mistake of fact, we ask only whether the mistake was reasonable." (emphasis omitted)). By contrast, mistakes of law, reasonable or otherwise, can never support probable cause. *Id.* ("[T]he correct question is whether a mistake of law, no matter how reasonable or understandable, can provide the objectively reasonable grounds for providing reasonable suspicion or probable cause. The answer is that it cannot." (quotation omitted)).

The Fourth Amendment also permits a warrantless traffic stop in another circumstance. "[P]olice may conduct a brief, investigatory traffic stop if they have reasonable suspicion based

on articulable facts that a crime is about to be or has been committed. A stop and search can be reasonable even if the defendant did not actually commit an offense as long as the officer reasonably believed an offense occurred." *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) (citations omitted). Reasonable suspicion requires "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. It is something less than probable cause and more than a hunch." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) (quotation and citations omitted). In determining whether reasonable suspicion exists, "courts must examine the totality of the circumstances known to the officer at the time the stop is made." *United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004) (citation omitted).

With those standards in mind, the Court will examine whether the Fourth Amendment authorized Officer Borgmann's traffic stop of the Denali. Next, the Court will turn to Deputy Ernestes' stop of the Scion.

### 1. The Denali

With respect to identifying the facts that Officer Borgmann knew at the time of his traffic stop of the Denali, the Court has made specific findings of fact above. In summary and regarding the Denali, Officer Borgmann saw Mr. Taylor, a black male, driving the Denali with Ohio plates, slightly below the speed limit, with arms in the "10-and-2" position commonly taught in many drivers' education courses. These observations occurred at a time when Mr. Taylor was likewise able to observe that he was in the presence of a police vehicle and, if common experience is any guide, likely sought to take extra care to comply with traffic laws. Upon continued observation of the vehicle, all visible occupants appeared restrained, and the Denali continuously drove within its lane, perhaps approaching—at worst fleetingly touching, but never crossing— the white fog lines on the right-side of the interstate. Officer Borgmann also reasonably believed

that the Denali was travelling with the Scion, which was following it, also had Ohio plates and was being driven by another black male.

Turning to step two in the analysis, the Government has asserted, [dkt. 150 at 11-12], that probable cause existed for violations of three Indiana laws: Indiana Code §§ 9-19-10-2; 9-21-8-11; and 9-21-8-24. The Court will discuss each in turn.

Indiana Code § 9-19-10-2 requires every occupant in a vehicle to "have a safety belt properly fastened about the occupant's body at all times when the vehicle is in forward motion." Because the Court has rejected the only evidence submitted to support a belief that anyone was not properly restrained—Officer Borgmann's claim that he saw a foot in the window—probable cause did not exist to believe a violation of this statute had occurred. *MacDonald*, 453 F.3d at 962.

The second statute potentially at issue is Indiana Code § 9-21-8-11. Among other things, it requires that drivers on roadways with three or more lanes, like Interstate 70, "drive[] as nearly as practicable entirely within a single lane." Ind. Code § 9-21-8-11(1). While the Government argues that probable cause existed because Officer Borgmann saw the Denali cross the fog line, [*see* dkt. 150 at 12], Officer Borgmann believed, at most, that the Denali's tires only drove "on-to" the fog line, [Ex. 5 at 1.] Thus that portion of the Government's argument is inconsistent with its own evidence.

To the extent that the Government argues that probable cause existed because, on one occasion, Officer Borgmann might have reasonably believed that the Denali momentarily and slightly touched the fog line, that argument fails as a matter of law. The statute commands only that drivers drive "as nearly as practicable within" the lane. While no Indiana case has addressed whether briefly touching a fog line violates the statute, courts in other jurisdictions have

interpreted similarly worded statutes, and have rejected the Government's argument. *See United States v. Colin*, 314 F.3d 439, 444 (9th Cir. 2002) (collecting cases holding that momentarily touching but not crossing a dividing line does not violate a statute requiring that a driver drive as "nearly as practical entirely within a single lane." (emphasis omitted)). In opposition to those cases, the Government has collected cases of its own. Those cases are, however, irrelevant. They involve fact patterns involving "erratic" driving across one or both fog lines, *United States v. Rogers*, 387, F.3d 925, 934 n.9 (7th Cir. 2004); *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991); or "partially swerving off the roadway," *United States v. Fiala*, 929 F.2d 285, 288 (7th Cir. 1991). No such behavior occurred here. Accordingly, in construing this statute, the Indiana Supreme Court would likely agree with the reasoning of the cases holding that merely and briefly touching a fog line comports with the plain meaning of the legislative command to drive "as nearly as practicable" within the lane. *Clifft v. Ind. Dep't of State Revenue*, 660 N.E.2d 310, 316 (Ind. 1995) ("We ascertain and implement legislative intent by giving effect to the ordinary and plain meaning of the language used in the statute." (quotation omitted)). This Court must, therefore, do so, too. *E.g.*, *McDonald*, 453 F.3d at 960 (citation omitted).

As for the third statute potentially at issue, it prohibits, among other things, changing from one "traffic" lane into another "unless the movement can be made with reasonable safety." Ind. Code § 9-21-8-24(3). Assuming without deciding that the right shoulder constitutes a "traffic lane" for the purposes of the statute, the evidence presented at the hearing establishes that the Denali's travel was, at all times relevant here, completely safe to the occupants and to the public at large. Indeed, the Denali's driving was significantly more safe than that of Officer Borgmann, who was both talking on his cell phone and using his computer while driving, who was veering

out of this lane across the fog lines and onto the ridged pavement, and who at times traveled significantly faster than the Denali. It would be highly unreasonable for any observer to conclude that the Denali's movements vis-à-vis the fog line—whether toward or onto it—were unsafe. Accordingly, no probable cause existed for a violation of Ind. Code § 9-21-8-24(3).

Having found no probable cause to believe that any traffic violation occurred, the Fourth Amendment will require suppression absent "reasonable suspicion based on articulable facts that a crime is about to be or has been committed," *McDonald*, 453 F.3d at 960 (citations omitted). The Court notes that the Government makes no argument in this regard in its post-hearing brief, [*see* dkt. 150 at 11], apparently because the facts as established at the hearing would not support its application. The Court agrees. At best, Officer Borgmann had a hunch that the occupants of the Denali were involved in illegal drug trafficking. But the Denali's safe operation—from its speed, to its lane control, to the driver's driving posture—gave no reasonable basis to believe that the hunch would be correct before the stop. Nor did the fact that two out-of-state cars were driving together on the highway, as many families do when traveling together. Accordingly, reasonable suspicion was also not present.

Because neither probable cause nor reasonable suspicion existed so as to justify the stop of the Denali, the Court will grant Mr. Holmes' motion to suppress. The Government may not admit into evidence, as to Mr. Holmes only, the products of the search of the Denali and the questioning of its occupants.

### 2. *The Scion*

As indicated above, and with respect to the first step of the two-step analysis, the Court has already found that Deputy Ernestes observed the Scion traveling with less than two seconds of braking distance behind the Denali.

Moving to step two, Indiana law provides: "A person who drives a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of both vehicles, the time interval between vehicles, and the condition of the highway." Ind. Code § 9-21-8-14. Probable cause to believe that a driver has followed another too closely exists when the distance between the two vehicles is under two seconds' travel. *See United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (holding that "the 'two-second rule' as a guide for reasonableness comports with Indiana law" at least for the purposes of establishing probable cause to believe a violation of Ind. Code § 9-21-8-14 has occurred).

Because the Scion was less than two seconds behind the Denali, probable cause existed to authorize the traffic stop under the Fourth Amendment. It makes no difference under the Fourth Amendment—the only constitutional claim asserted—whether the stop were pretextual, as Mr. Peters claims, [dkt. 151 at 3]. *Whren*, 517 U.S. at 813 (collecting cases that "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the officers involved" and explaining that "the constitutional basis for objecting to intentionally discriminatory application of the laws is the Equal Protection Clause, not the Fourth Amendment").

Two other arguments merit brief mention, though neither can prevail. First, insofar as Mr. Peters argues that Deputy Ernestes required, but lacked, reasonable suspicion to follow the Scion on a public interstate in the first instance, [*see* dkt. 151 at 2-3], that claim has no support in the case law, *United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."). Second, insofar as Mr. Peters' counsel suggested during her cross-examination that Deputy Ernestes' approach behind the Scion essentially pushed the Scion closer

to the Denali, the failure to press that argument in the post-hearing briefing means it "is waived due to lack of development," *Kawasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 (7th Cir. 2011) (citation omitted). Furthermore, nothing in the record foreclosed two obviously safer alternatives to travelling so closely behind the Denali: braking or moving into the left-hand lane. Accordingly, the Court rejects both arguments.

### C. Continuing Validity

The Court's finding that the Fourth Amendment did not authorize the initial stop of the Denali necessarily moots consideration of its scope or length of the stop.[7] In contrast, because the stop of the Scion was constitutionally permissible—thereby allowing its passenger, Mr. Peters, to be placed in custody—the Court must consider whether the custody remained permissible through its conclusion. *See, e.g.*, *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc) ("Childs was placed in custody by the stop of the car in which he was a passenger. That custody's nature and duration must be 'reasonable' under the fourth amendment, so we must consider the possibility, not that each question is a 'seizure,' but that questioning may render the physical detention unreasonable.").

The Court finds that Mr. Peters has no valid basis to object to the length of the traffic stop because he was properly placed under arrest approximately seven minutes after the stop began.

---

[7] The Court would note that, had the initial stop of the Denali been authorized, the facts as established at the hearing demonstrate that the stop was not unreasonably long under the circumstances, for the reasons set forth in the Government's post-hearing brief, [dkt. 150 at 15-16]. In particular, Officer Borgmann's inability to validate Mr. Taylor's driver's license, together with the contradictions between Mr. Taylor's and Mr. Holmes' statements justified further investigation. Officer Borgmann's use of his drug-detection dog to perform a brief, open-air sniff to help his investigation did not violate the Fourth Amendment. *Caballes*, 543 U.S. at 409 ("[T]he use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (quotation omitted)). The results of that dog sniff established probable cause to immediately search the vehicle.

Mr. Adams had neither a license nor insurance card with him when he exited the Scion (and in fact later investigation would reveal that Mr. Adams had a suspended license). When Deputy Ernestes approached Mr. Peters, sitting in the passenger seat, to ask for the paperwork in the glove box, Deputy Ernestes smelled burnt marijuana and saw green leaves on Mr. Adams' lap, which upon physical inspection appeared to be marijuana. Those facts alone authorized Deputy Ernestes to immediately arrest Mr. Peters for possession of marijuana and to search the Scion. *See United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (collecting cases holding that law enforcement may conduct a warrantless search of a vehicle that smells of marijuana); *United States v. Price*, 2008 U.S. Dist. LEXIS 24945, *10 (N.D. Ga. Mar. 28, 2008) ("[T]he officer noticed a strong odor of marijuana and, looking inside the car, observed marijuana in the ashtray…. [T]his observation of marijuana … provided the officer with probable cause to arrest the defendant and then to search the car…."). Deputy Ernestes did so.

Because Mr. Peters makes no claim that any unconstitutional delay occurred between the moment of Mr. Peters' arrest and his transport to booking, [*see* dkt. 151 at 5-6], nor claims that seven minutes was unreasonably long to effectuate the arrest, [*see id.*], the Court finds that the Fourth Amendment was not offended when Mr. Peters was arrested upon probable cause during a lawful traffic stop for possessing a controlled substance. His motion to suppress must, therefore, fail in its entirety.

## CONCLUSION

Mr. Holmes' motion to suppress, [dkt. 117], is **GRANTED**. The Government may not admit into evidence, as to Mr. Holmes only, the products of the search of the Denali and the questioning of its occupants. The Government and Mr. Holmes' counsel are ordered to confer within **two days** about the impact of the Court's ruling on Mr. Holmes' continued detention and to file a status report with the Court after the conclusion of that conference.

Mr. Peters' motion to suppress, [dkt. 114], is **DENIED**.

04/03/2012

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Melanie C. Conour
UNITED STATES ATTORNEY'S OFFICE
melanie.conour@usdoj.gov

Dorothy Ann Maryan
GILROY KAMMEN & HILL
doriehertzel@gmail.com

Richard Kammen
GILROY KAMMEN & HILL
richard@kammenlaw.com

Belle Choate
CHOATE & HAITH
choate@iquest.net